Judge Buckner
delivered the opinion of the court.
Forman and others, having obtained judgments against Lewis Craig, he replevied the debts, with his brother Elijah Craig as his surety, by recognizances in the clerk’s office. Before they became due, being on the eve of his departure for New Orleans, he executed to Elijah a power of attorney, bearing date on the 15th of August, 1821, giving him the control of all his property, consisting of land, ne-groes, &c., with full authority, as his agent, to attend to all his business during his absence, which he accepted, and acted under it. Previous to his return, executions, in the cases alluded to, issued, for sums amounting to more than two thousand dollars. By the directions of the agent, the officer levied them upon a female slave named Rose, and her six children, the property of said Lewis; which were advertised ..and sold accordingly. Before the day of sale, Elijah and Whitfield Chug, who was also a brother of Lewis, entered separately into negociations with For-man, to whom much the largest portion of the money, to be raised by the sale, was due, for the purpose of obtaining the command of his executions. Forman, whb seems to have been kindly disposed towards Lewis Craig, under the influence of representations made to him ,by Elijah, that Whitfield’s object was.to speculate upon the misfortune and embarrassments of his absent brother, by purchasing the slaves for his own benefit, whilst he designed only to act as his agent, *172 by purchasing a family of slaves to which his brother was attached; and which, should he succeed in doing so, he intended to permit him to redeem, by paying the amount at which they might be cried off; refused to make any contract on the subject with Whitfield, but agreed to let Elijah have the benefit of his executions, if he would use them for the purpose proposed, it was accordingly stipulated, although the sale, as to Forman’s demands, were to be made for specie,, that Elijah Craig should execute his own note, with Chiles as his surety, to Forman, for the amount of the executions in his favor, payable in one year after date, in Kentucky bank-notes, and purchase the slaves in ilie way proposed; and a note was in that way executed' for $1,704 01.cent. On the day of the sale, which took place in the latter part of the full, or beginning of winter, 1821, it was made known by Elijah to the company present, that he was the agent of Lewis: and he then publicly expressed a hope that, as be xvas acting for the benefit of an unfortunate brother, none would bid against himl Whether the persons present were operated on, by the considerations urged, it is not important to enquire. No one^ however, did bid against him except Whitfield. The slaves were sold for specie as to Forman’s execution, and for Kentucky bank-paper as to the other executions, and were cried off to Elijah Craig, he being the highest bidder, at the price of $2,926; which xvas about txventy or thirty dollars less than the aggregate amount of all the executions, under which the sale took place. Elijah, at the same time, borrowed-of Forman $500 in Kentucky bank-notes, to enable him to pay the amount of his purchase aforesaid, for which he, with Chiles as his surety, executed his note.
On the return ofLewis from Orleans, feeling anxious to redeem the slaves, .but being without the necessary funds to accomplish his object, he entered into an arrangement with his brothers Whitfield and John, xvho agreed to aid him. The former advanced for that pur-, pose $597,in Kentucky bank-notes ;the latter advanced a.sum,-in Commonwealth’s paper, the amount of which, is the subject of controversy, which were paid.to For-man, for the purpose of obtaining from him, the notes executed by Elijah Craig and Chiles. There was still a balance due on those notes of $511, for which For- *173 man accepted the note of Lewis, with Whitfield and John Craig as sureties, payable in Kentucky banknotes; and in December, 1822, he assigned and delivered to Lewis the two notes, which had been executed to him by Elijah Craig and Chiles, that they might -be delivered to Elijah, and the slaves redeemed.
At' the time those sums- were advanced1, it was agreed by Lewis, Whitfield and John, that the two latter should have a lien On the slaves, if they should be obtained from Elijah, and if not, on the notes assigned by Forman, to indemnify them against responsibility as to the note for $511, in which, they had joined as Lewis’ sureties, and to secure to them the repayment of the sums advanced; and to this end, the notes were deposited with a Mr. Paxton for safe keeping.
On the Istof January, 1823, Lewis Craig, to whom they had been delivered for the purpose, tendered them to Elijah, and also tendered the thirty dollars, which the latter had paid, exceeding the amount of the two notes which he and Chiles had executed, and demanded a delivery of the slayes; which was refused, unless upon payment of four hundred dollars, as a compensation for his trouble and risk in keeping them; insisting, as a justification for his refusal, that Lewis was unable himself to redeem, but was attempting to do it through the aid, and for the benefit, of his other two brothers.
Not long after this Elijah, with the intention of se* curing the slave? to himself, demanded of Lewis a production of his and Chiles’ notes, declaring his ability and willingness to pay them immediately; but Lewis seemed disposed to evade the demand, and replied, that the notes had been deposited with another persorif or, in his language, hfd been placed win deposit.”
Elijah subsequently carried the money to John, and offered to pay it to him, who refused to receive it; saying, (hat the notes of Elijah were better than specie, because they (alluding to himself and Whitfield,; wantéd the negroes. Upon this, Lewis instituted his bill in chancery .against Elijah, making Chiles also a defendant, praying that he might be permitted to redeem the slaves, upon the delivery and cancellation of the $1,704 01 cent note, and of that for tf‘5O0, and *174 upon payment of the $30. Elijah answered, contest' *n8 ^le r‘ght set l,P> praying that his answer might be taken as a cross-bill against Lewis, and calling on John and Whitfield to answer it. Lewis answered, relying on the same grounds set forth in his bill; John and Whitfield did not answer directly; but each filed a in the nature of an interpleader, and each insisting upon an enforcement of his lien. Whitfield moreover alleged that, since the commencement of this controversy, he had paid off the note for §511 to For-man, in which he and John had joined Lewis as sureties. John charged, that he advanced, for the purpose of redeeming the slaves, a check, drawn on the Limestone bank in his favor, by one Carter, for a little upwards of$>1,200 in Commonwealth’s bank-notes, and calls on Lewis to answer to the allegation. Lewis admits, that John had advanced about fifteen dollars of the money paid to Forman; but expressly denies, that the check alluded to was advanced by John, or that he had ever agreod to give him a lien on the slaves, except for the fifteen dollars, and to secure him against responsibility on the note of $511 to Forman, which Whitfield subsequently discharged. He insists, that he and John, in partnership, owned an equal interest in the Union Mills, which (hey sold to Carter; that John had received his full portion of the price; and that the check alluded to had been drawn in John’s favor, who handed it to him, as a part of the price to which he was entitled.
In September, 1826, Rose, one of the slaves, died; and an admission of the fact was, .by consent of the parties, spread on the record, instead of pleading it.
In March, 1827, the cause, in which Lewis Craig was complainant, came on for hearing, by consent, the court reserving for future consideration the interests of John and Whitfield Craig. An interlocutory decree was entered, in whicli it is declared to be the opinion of the court, that Elijah Craig was bound to return the slaves to Lewis, together with one born after his (Elijah’s) purchase, and to pay a reasonable compensation for their services, from the 1st of Jan. 1823, upon payment of the value of the thirty dollars, which Elijah had advanced in paper, over the amount of the executions of Forman, and the money lent by *175 him to Elijah; as it satisfactorily appeared, froto the proof in the cause, that the two notes executed by Elijah and Chiles to Forman,'had been assigned to Lewis, and by him had been tendered to Elijah, with the thirty dollars. .
As to the slave which had died, the court was of opinion that he was not answerable for her value. Commissioners were then appointed to take an account of the services of the slaves, deducting necessary expenses, &c. preparatory to a finai decree. And, as Elijah Craig expressed a wish that some person should be appointed to take possession of the slaves, and the parties concerned agreeing that they should be delivered to Whitfield Craig, for the purpose of being hired out during the pendency of the suit, it was further decreed and ordered, that Elijah should surrender them to him for that purpose, who was directed to keep them, subject to the further order of the court. The commissioners were directed to take an account, up to the lime at which-Elijab might make the surrender. On the 26th of March, 1827, Elijah did surrender them to Whitfield, in pursuance of the decree. Shortly after this, Elijah Craig departed this life, and the suit, in August, 1827, was revived against his widow Mary, as his administratrix with his will annexed.
In February, 1830, a commissioner was appointed to ascertain the amount of the hire of the slaves, from the time they were delivered to Whitfield; and the value of tile bank-paper paid by him on the note of |¡511, executed by him,&c. to Forman; who reported accordingly, at the May term, 1830; at which time, the causes, on Lewis’ bill and on the cross-bills, were taken up and tried, by (be consent of the parties; when it was decreed, that the administratrix of Elijah Craig should pay to Lewis Craig the sum of $199, as the balance due to him, as appeared by the report of the commissioner, for the hire of the slaves, after deducting the expenses of keeping them, &c. whilst Elijah liad them in possession, and costs. It was also decreed, that Whitfield Craig should recover the amount of the $511 from Lewis, with interest thereon, when scaled to its specie value, which the former had paid for him to Forman, deducting therefrom the amount *176 of the hire of the slaves' whilst he had them; but that he .should recover the §537,lent in paper of the bank of Kentucky, in notes of the same bank, with interest thereon, because he entered on the record that he would receive them; and that lie should have his lien, for the purpose of enforcing payment of those sums, an the. slaves redeemed by Elijah, it was also deemed, in favor of John, that he should recover the value of the $1,200, alleged to be advanced by him, in a check on bank, for notes, when reduced to its specie c,due. deducting therefrom fortj-five dollars for the services of one of the slaves, which John had hived; and that he also had alien on the slaves, to secure its payment; and to enforce the liens in each case, a commissioner was appointed to sell them, or so many of them as might, be necessary, forthwith, upon a credit of three months, taking bonds to the said Whitfield for his portion, and to John for his, to have the force of replevin-bonds, after having advertised ' the time and place of sale, &c.
After the causes had been heard, and the court had verbally pronounced its decree, but before it lmd been entered of record, Lewis Craig filed his petition for' a delay of the cause, to afford him an opportunity of introducing additional proof, in relation to his alleged interest in the mills above mentioned, and to show that he was not properly liable to John for the §1,200 check, relying upon grounds, which he therein sets forth, but which it is not necessary here to'notice in detail. The court overruled his petition, and the decrees as mentioned were entered. To reverse them Lewis prosecutes this writ of error, and assigns as grounds of error, in the case against Elijah, &c. which we shall first notice, that the court erred in refusing to decree, in his favor, the value of the slave Rose, and that the decree was for less, in other respects, than he was entitled to.
On the part of the plaintiff in error, it has been urged that although, as-a general rule, property pledged remains at the risk of the person pledging it; yet if the money due be tendered, and the persoi holding the property refuses to restore it, he does so . at his own risk; and must account for its value, if it should be lost or destroyed, even without any negligence on his part. We shall not discuss this proposi *177 -tíon; because,however undeniable it may be,ut isnol •applicable toihis c'ase. The slaves were not.pledged to secure the payment of money. The purchase, moreover, was not made with the funds of L. Craig; for he had left the state without making any provision to meefthe demands against him; nor was it made by Elijah in Lewis’s name, but in bisown, with inducements held out to those, present, no doubt with the intention of preventing them from bidding against him; that he was anxious to purchase the slaves with the design of permitting his brother to redeem them. Nor was the money borrowed from Forman, and the command of his executions, obtained upon the responsibility of the'plaintiff in error. Suppose that Elijali Craig, not wishing to keep the slaves, on •account of the death of one or more of them, or because he had given for them a price greatly beyond their value, had filed-his bill to compel Lewis Craig to redeem them; or, offering to -restore the Slaves, had Instituted his action at law,, to recover from him the ■sum paid to the sheriff as the.price of them, could he have succeeded? We do not perceive the ground-upon which his success could be justified. All that he did, in relation to the purchase of the slaves, was upon his own responsibility, and'without any-authority or request from his brother. Still, we do not say that it would follow, as a necessary consequence, from this, that the plaintiff in error would have no right toca .-restoration of the slaves, upon the payment to Elijah of the money-advanced by him. But such right, if it .existed, could not be placed on the ground that Elijah held the property as a pledge, but uponthe ground of the fraud practised, in making the purchase under the inducements held out to those present, who might otherwise have bid against him. We do not intend, however, to advance any positive opinion with respect to the true ground,' upon which Lewis Craig’s right to demand the slaves should be placed, further than to say,that it cafrnot be supported upon the allegation, that Elijah Craig held them as a pledge to secure the repayment of money; and it is only in cases of refusal, to restore property pledged upon the tender of the money due, that it has been insisted the rule alluded to should be applied. Upon the whole case we are satisfied, that the plaintiff in error is not entitled to *178 any allowance for the loss of the slave Rose, and iha£-the circuit court, in the decree under consideration, extended to him the full measure of justice, to which he could properly claim to be entitled.
The decree, as to the claim against Elijah Craig’s estate, must therefore be affirmed with costs.
In the decree in favor of Whitfield and John, the errors alleged are sufficiently broad to present the case properly for adjudication.
The petition to arrest the decree, and permit the •introduction of other testimony;, was properly overruled. It docs not appear that any of the proof of the plaintiff in error was excluded. lie could not therefore complain of surprise. He does, it is true, say that he did not learn, until after the case had been taken up for hearing, and the papers partly read, that a paper filed in the cause would be excluded. But it does not appear that the paper alluded to was excluded. Some-of the other, matters, relied on in the petition, were irrelevant to the matter in controversy.. Besides, it would be setting a very dangerous and inconvenient example, to arrest the progress of a case after the unsuccessful party had heard the decree; and thereby afford him an opportunity of mending his hold, by bringing in additional testimony', to points to which the attention of Ihe parlies had been previously called. If it was proper to listen to such an application at all, he should have made it when he first discovered his’ want of preparation; which was, as lie says, after the trial had commenced, but before they had-finished the reading of the papers.
But the decree is, in other respects, erroneous, to the prejudice of the plaintiff in error. The decree in favor of John Craig, cannot be supported by the proof in the cause. The charge made by him, in relation to his alleged lien for the $1,210 check drawn by Carter, is expressly denied by the plaintiff in error, in his answer; and without deeming it necessary' to enter into an argument, to be drawn from the testimony on the one side and the other, it is sufficient to say that, in the face of that positive denial, the proof is, in our opinion, insufficient to establish the lien. Whether the check was lent, by' John to Lewis, or not, it is not necessary here to decide. Howevep *179 -that matter maybe, the proof is not sufficient to show that any lien grew out of it; and whether it was lent, or delivered to Lewis as a part of the price of the mills, may be the subject of controversy in another suit.
Mills, Brown, Wickliffe, and Woolley, for plaintiff; Reid, for defendants..
The decree in favor of John must be reversed with costs, and his cross-bill dismissed; for, although Lewis admits an advancement of fifteen dollars by him, and a lien in- his favor for that sum, the hire of one of the slaves, which he kept for some time, and which the commissioners, appointed for the purpose, reported to amount to forty-five dollars, must be considered as extinguishing, that-claim»
The decree in favor of Whitfield Craig is also erroneous, in several particulars; and in the first place, in not scaling his demand for the $597 to the specie standard, when it became due, instead of decreeing it, to be paid in bank-paper. If the act of the legislature, authorizing judgments to be entered for bank-paper, can be applied to a decree in a case like this, it has been long since decided, that notes executed previous to the passage of the act, are not embraced by its provisions. See the cases of Feemster vs. Ringo, V Mon. 336, and of Duckham vs. Smith, Ib. 372. Secondly, in decreeing that the slaves should be sold, without giving a day in term-time to redeem. His hen is similar to that created by a mortgage; and if in such cases, as has often been decided, the court ought not to leave it to the commissioners to determine, whether the money decreed has been paid, so ought it not to have been done in this case. For the reasons mentioned, the decree in his favor must be reversed with costs, and the cause remanded, that a decree may be entered in accordance with this opinion.